IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Timothy G. Collins,      :
        Petitioner  :
             :
    v.       : No.  825 C.D. 2023
           : Submitted:  September 9, 2024
State Employees' Retirement Board, :
        Respondent :

BEFORE: HONORABLE PATRICIA A. McCULLOUGH, Judge
     HONORABLE STACY WALLACE, Judge
     HONORABLE MATTHEW S. WOLF, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WALLACE       FILED:  November 21, 2024

Timothy G. Collins (Claimant), *pro se*, petitions for review of the State Employees' Retirement Board's (Board) June 12, 2023 order denying Claimant's request for the State Employees' Retirement System (SERS) to reclassify his employment as age 50 superannuation service under Section 5102 of the State Employees' Retirement Code (Code),[1] 71 Pa.C.S. § 5102.  Upon review, we affirm.

## I. Background

Claimant began his employment under SERS on August 18, 1980, as a Clerk Typist 2 for the Department of Education (DOE) at the State Correctional Institution at Pittsburgh (SCI-Pittsburgh).  Supplemental[2] Reproduced Record (S.R.R.) at 205b.

---

[1]  71 Pa.C.S. §§ 5101-5958.
[2]  Claimant's *pro se* Reproduced Record did not contain many of the documents necessary for our review in this matter.  The Board, however, filed a Supplemental Reproduced Record.

In October 1987, Claimant began working for the Department of Corrections (DOC) as an Administrative Officer 2 in the Clerical and Records Department at SCI-Pittsburgh. *Id.* In February 1992, the DOC promoted Claimant to the position of Corrections Superintendent Assistant 2 at SCI-Pittsburgh, and he held this position until he retired on May 27, 2001. *Id.* at 203b, 205b. Claimant was 45 years of age when he retired, and he elected to receive an immediate withdrawal annuity, commonly known as early retirement. *Id.* at 203b-05b.

To contextualize Claimant's current request, a brief overview of the relevant Code provisions is necessary. The Code utilizes a "superannuation age" to determine when an active member (generally, a state employee contributing to the SERS pension fund) becomes eligible to receive annuity benefits (pension payments). *See* 71 Pa.C.S. § 5102. An active member's "superannuation age" is based on his age or total "eligibility points," which are a measurement of the length of the employee's service. *See* 71 Pa.C.S. § 5307 ("An active member of the system shall [generally] accrue one eligibility point for each year of credited service as a member of the system . . . ."). For most classes of employees, the "superannuation age" is defined as "any age upon accrual of 35 eligibility points or age 60." *See* 71 Pa.C.S. § 5102. A "correction officer," however, has a "superannuation age" of 50. *Id.*

Once a qualified Commonwealth employee attains his "superannuation age," he is generally eligible "to receive a superannuation annuity upon termination of State service" and compliance with state regulations. *See* 71 Pa.C.S. § 5308. If an active member retires before reaching his superannuation age, his pension benefit is reduced by a "factor calculated to provide benefits actuarially equivalent to an annuity start at superannuation age." *See* 71 Pa.C.S. § 5702. Here, Claimant retired

at 45 years of age, and SERS classified his service with a superannuation age of 60. As a result, the amount of his monthly annuity payment was greatly reduced by the Code's actuarial reduction factor. If SERS were to reclassify Claimant's service with a superannuation age of 50, the Code's actuarial reduction factor would be far less, meaning Claimant would receive a substantial increase in his monthly pension benefits. *See* S.R.R. at 203b. To achieve that result, Claimant's employment would have to qualify him as a "correction officer." *See* 71 Pa.C.S. § 5102.

> As the Board properly noted,
>
> during Claimant's Commonwealth employment, there have been three definitions of "Correction officer" in the [Code]. As originally enacted in 1974, and in effect when Claimant began his DOE service as a Clerk Typist 2, the definition read:
>
>> "Correction officer." Any employee whose principal duty is the care, custody and control of inmates of a penal or correctional institution or community treatment center operated by the Department of Justice.
>
> Act of March 1, 1974, P.L. 125, No. 31.
>
> In 1982, while Claimant was still a DOE Clerk Typist 2, the definition was amended to read:
>
>> "Correction officer." Any employee whose principal duty is the care, custody and control of inmates of a penal or correctional institution or community treatment center operated by the Bureau of Correction.
>
> Act [of] December 14[, 1982, P.L. 1249, No. 284, retroactive effect] to January 1, 1982.
>
> Act [of August 5, 1991, P.L. 183, No. 23] amended the definition into its current form:
>
>> Any full-time employee assigned to the [DOC] or the Department of [Human Services] whose principal duty is

3

the care, custody and control of inmates or direct therapeutic treatment, care, custody and control of inmates of a penal or correctional institution, community treatment center, forensic unit in a State hospital or secure unit of a youth development center operated by the [DOC] or by the Department of [Human Services].

71 Pa.C.S. § 5102.

S.R.R. at 214b.

On August 18, 2017, more than 16 years after Claimant first began receiving pension benefits, Claimant sent a letter to SERS requesting an audit of his retirement account to determine if his benefits should have been calculated based on age 50 superannuation instead of age 60 superannuation. S.R.R. at 206b. Claimant alleged the nature of his work fell under the definition of a "correction officer" under Section 5102 of the Code, because he "worked with the inmate population on a daily basis." *Id.* at 206b, 235b.

In response, a SERS representative reviewed Claimant's account, obtained and reviewed information from the DOC related to Claimant's employment history, and determined nearly all[3] of Claimant's employment qualified as age 60 superannuation service. S.R.R. at 206b. SERS notified Claimant of this determination by letter on November 8, 2017. *Id.* Claimant appealed SERS' determination to SERS' Appeals Committee, which denied Claimant's appeal. *Id.* at 206b-07b. Claimant further appealed to the Board. *Id.* at 207b.

The Board appointed a hearing officer, who conducted an evidentiary hearing. S.R.R. at 207b. At the hearing, Claimant and two of Claimant's former co-workers

---

[3] SERS determined 0.1406 years of Claimant's employment (when Claimant was an Adult Corrections Specialist between October 4, 1982, and June 30, 1983) should have been credited as age 50 superannuation service. S.R.R. at 206b. SERS increased Claimant's monthly pension payment by $0.82 due to this re-classification. *Id.* at 49b. The status of that service, for the .1406 years, is not at issue on appeal.

4

at SCI-Pittsburgh testified on Claimant's behalf. *Id.* SERS presented the testimony of the employee who reviewed Claimant's original request and an administrative officer. *Id.* Before the hearing officer received the parties' briefs and issued a recommendation, he "left his position as a hearing officer." *Id.* As a result, the Board appointed a second hearing officer, John D. Kelly, Esquire, ("Hearing Officer Kelly") to handle this matter. Hearing Officer Kelly filed an Opinion and Recommendation with the Board on June 4, 2020, in which he recommended the Board grant Claimant's request for age 50 superannuation. *Id.* at 43b-59b.

The Board determined the record was not complete or "ripe for adjudication" because there was "no indication in the record that the [Pennsylvania] Office of Administration ('OA'), the DOE or the DOC were notified of this appeal or of their right to intervene, and none of those agencies [had] intervened." S.R.R. at 81b. As a result, the Board remanded this matter and reopened the record "for the introduction of additional evidence and submission of additional argument" by OA, DOE, or the DOC, if they intervened. *Id.* at 82b.

The Board appointed Monty J. Batson, Esquire (Hearing Officer Batson), to handle the remand hearing because Hearing Officer Kelly left his position as a hearing officer while the Board was initially considering this matter. S.R.R. at 208b. The DOC intervened and presented the testimony of two witnesses at the remand hearing. *Id.* Hearing Officer Batson then filed a Supplemental Opinion and Recommendation with the Board on September 23, 2022, in which he also recommended the Board grant Claimant's request for age 50 superannuation. *Id.* at 135b-52b. SERS and the DOC filed exceptions to Hearing Officer Batson's Supplemental Opinion and Recommendation. *Id.* at 208b.

5

Hearing Officer Kelly summarized Claimant's and his witnesses' testimony regarding Claimant's employment duties as follows:

29.     While employed as a [Clerk Typist 2], Claimant worked in the "schoolhouse building" at SCI[-]Pittsburgh on a daily basis.

30.     Claimant's actual duties as a [Clerk Typist 2] within the schoolhouse building included, among other things, proctoring periodic GED examinations and assisting in maintaining daily security by conducting visual inspections of the classrooms and escorting female instructors to the bathroom, which did not have a lock.

31.     The schoolhouse building was located at or near the center of the facility.

32.     Employees entering the schoolhouse building were required to pass through five (5) gates.

33.     Employees such as Claimant who were responsible for inmate supervision in the schoolhouse building supervised several hundred inmates each day.

34.     There were no Corrections Officers . . . present in the schoolhouse building during operating hours.

35.     Classroom instructors were responsible for basic inmate supervision in the classroom.

36.     The inmates attending classes in the schoolhouse building included "the worst of the worst."

37.      Inmates were not handcuffed while they were in the schoolhouse building.

38.     Claimant was among those employees who were the "initial responders" when a fight or disturbance broke out in the schoolhouse building.

39.     As Data Supervisor, Claimant supervised both the clerical and the records departments.

40. One of the duties of the personnel in the records department, including Claimant, was to process incoming inmates by, among other things, photographing and fingerprinting them.

41. Claimant served as the Notary Public for inmates who needed documents to be notarized.

42. As [Corrections Superintendent Assistant] 2, Claimant was in charge of the inmate grievance system. He was also the litigation coordinator, compliance officer and press officer.

43. Claimant's duties as a [Corrections Superintendent Assistant] 2 took him to every part of the facility, including the towers, prison blocks and segregation areas.

44. As inmate grievance officer, he received approximately 100 grievances per week and was required to investigate them by, among other things, conducting in-person inmate interviews on the cell blocks, or in the yard or segregation units.

45. Inmates filing grievances had the right to request a personal interview, and Claimant met with inmates "almost every day or every other day" for grievance investigation purposes.

46. As compliance officer, Claimant was required to inspect the cell block for compliance with accreditation requirements for living conditions such as heating, cooling and ventilation, cleanliness and general maintenance.

S.R.R. at 49b-51b (record citations omitted).

While Claimant had focused on his perceived job duties, SERS and the DOC focused their presentation of evidence on Claimant's job descriptions. As the Board properly noted, "Claimant's Clerk Typist [2] position description expressly describes a clerical position." S.R.R. at 219b. Hearing Officer Kelly noted this position was defined as "moderately complex clerical work involving the processing of documents in a variety of functions." *See id.* at 46b. The job classification described "characteristic work assignments" of a Clerk Typist 2 as:

7

> Maintains alphabetic, numerical, chronological, and similar files . . . [,] [e]stablishes, reorganized or combines filing systems . . . [,] [s]earches files [sic] contents to retrieve hard-to-locate documents . . . [,] [f]unctions as a lead worker by distributing and interpreting work assignments . . . [,] [m]aintains control documents such as records and logs[,] [p]erforms arithmetic computations . . . [,] [p]roofreads[] and other clerical tasks.

*Id.* (citation omitted). As properly noted by Hearing Officer Kelly, this job classification "did not contain any reference to interaction with inmates in correctional facilities." *Id.* In addition, Hearing Officer Kelly noted that this job classification "was revised on May 1, 1981, but the revisions did not change the **clerical nature of the duties** and did not include any reference to direct interaction with inmates in correctional facilities." *Id.* at 47b (emphasis added).

Claimant's job as a Data Supervisor was defined to involve "responsible administrative work performing the full range of management functions for an organizational unit or agency." S.R.R. at 47b. This job classification described typical duties as:

> Directs a departmental program with primarily singular objectives, or assists in directing a larger program with more varied activities[,] [p]lans, organizes, assigns, and evaluates the work of a technical and clerical staff engaged in enforcing state regulations or facilitative services[,] [and] [d]irects and coordinates staff services such as office management, purchasing accounting, records management, budgeting, and personnel administration for a large departmental program or regional office . . . .

*Id.* Again, Hearing Officer Kelly properly noted that "[n]othing in th[is] job classification . . . indicated that a person . . . would be required to have the care, custody and control of inmates in correctional facilities." *Id.*

Finally, Claimant's job as a Correctional Superintendent Assistant 2 was defined as involving

8

professional and administrative work in providing staff and program support for the overall operation in a State Correctional Institution with an inmate population of 1,000 or more . . . . An employee in this class serves as institutional or facility accreditation coordinator which involves insuring compliance with operating standards for adult correctional institutions established by the Commission of Accreditation for Corrections. Work also includes the administration of the inmate complaint system; the conduct of investigations and preparing reports relative to legal actions filed by inmates against institutional personnel; and acting as public information officer which involves the preparation of news media releases and holding press conferences . . . . The employee in this case is required to serve as an administrative duty officer with other institution management staff.

S.R.R. at 47b-48b.

When the General Assembly modified the definition of a "Correction officer" in 1991, it required the OA to "certify to the [Board] a list of correction officers qualified under 71 Pa.C.S. § 5102." *See* Act of August 5, 1991, P.L. 183, No. 23. The OA did not originally certify any of Claimant's employment positions as a correction officer. *See.* S.R.R. at 210b. Regarding this original decision, the Board explained:

Although this Board has the final say in interpreting the [Code] and establishing the standards by which it will be applied, OA is tasked, as the agency with the most expertise in classification and personnel matters, to make a *prima facie* determination of which DOC employees have, as their primary duty the care, custody and control of inmates at state correctional institutions. We show deference to OA and a Claimant challenging the OA's determination has a heavy burden [of] showing that determination is in error. Thus, by design, the General Assembly charged OA with primary responsibility for determining which State Employees' positions satisfy the definition of "Correction officer." That is not to say the Board must blindly accept OA's determination; however, it does establish that SERS' reliance on OA's determinations about which positions are "Correction officers" for retirement purposes is reasonable.

*Id.* at 216b.

9

The DOC presented the testimony of Carol Noll (Noll), the Director of the OA's Bureau of Organization Management. *See* S.R.R. at 221b-24b. Noll "is responsible for the classification of Commonwealth employment positions and for the maintenance of the employment classification plan. This also includes working with SERS to certify positions as eligible for superannuation under the [Code]." *Id.* at 221b-22b (citations omitted). As the Board noted:

> Ms. Noll provided detailed, competent testimony regarding the manner and process used by OA and DOC to determine whether a particular position is one whose primary duty is the care, custody and control of inmates. As part of that process, Ms. Noll examines the job specifications, position description, and other factors involved in the particular job to determine whether the position meets the definition of Correction Officer. Her staff works closely with DOC program managers to classify positions. Agency program managers are asked to provide information about the actual work being performed. The duties of positions are analyzed, and a determination is made as to whether the position actually is required to exercise care, custody and control of inmates.

*Id.* at 222b. After reviewing the descriptions for Claimant's various positions, Noll opined none of them principally involved the care, custody and control of inmates. *Id.* at 222b, 223b.

The DOC also presented the testimony of Michael Zaken (Zaken), the then-current Superintendent at the State Correctional Institution at Green. *See* S.R.R. at 226b-27b. Zaken also worked at SCI-Pittsburgh as a Corrections Counselor while Claimant worked at SCI-Pittsburgh as a Superintendent Assistant 2 from 1998 until 2001. *Id.* at 226b. The Board summarized Zaken's testimony as follows:

> Mr. Zaken testified concerning the duties and responsibility of a Superintendent Assistant, a position that works directly under the Superintendent. The duties involve serving as the institution grievance

10

coordinator. He explained the inmate grievance system. When an inmate has a complaint, he may file a grievance. The Superintendent Assistant collects those grievances (which are deposited in boxes by the inmates) and assigns them to appropriate staff for investigation or response. Once the inmate is given a response, then the inmate may appeal the determination. The Superintendent Assistant serves as the coordinator of this process, ensuring that deadlines are met and that the appropriate staff are assigned to handle the responses. Serving as the grievance coordinator does not require meeting with inmates, as the vast majority of grievances are given to other staff to investigate and respond. If there is an occasion where a Superintendent Assistant interacts with an inmate in connection with the grievance process, the Superintendent Assistant has actual security - Correction Officers in the area - to maintain safety and security. This is also the case in any other situation that may place a Superintendent Assistant in an area where he or she is in the presence of inmates. Mr. Zaken testified that in these situations . . . th[e] Superintendent Assistant is not required or expected to maintain care, custody and control of the inmate. They are not trained to do so nor is it a requirement of the position.

Another primary responsibility of the Superintendent Assistant position is serving as the institution's accreditation manager. Mr. Zaken explained that institutions must meet many different standards to maintain accreditation. The standards cover nearly all areas of an institution - operations, physical plant, etc. However, while the Superintendent Assistant oversees that process, the various areas are assigned to appropriate staff for handling. This responsibility, like the grievance coordinator duty, does not require a Superintendent Assistant to meet one-on-one with inmates.

Mr. Zaken also addressed one of the other primary responsibilities of the Superintendent Assistant position - litigation coordinator. This duty requires the Superintendent Assistant to coordinate with the courts, lawyers, and at times, inmates, to facilitate video conferences or court appearances. Like the other duties, however, the Superintendent Assistant is never required to meet alone with an inmate, that it would be unusual, and it would be unauthorized. If security would ever be required in such a situation, *i.e.*, the need to restrain or redirect an inmate, security personnel are present to handle that function.

. . . Mr. Zaken [also] testified as to what [the Program Review] Committees involve and verified that like the other duties, the duties of a member on these Committees do not require the exercise of care,

11

custody and control. Security handles those duties. Inmates are escorted and monitored by security at all times.

Mr. Zaken addressed what "care, custody and control" means in the context of a correction facility. As he described throughout his testimony when explaining the various duties of a Superintendent Assistant, he emphasized that it is security personnel (i.e., actual Correction Officers) that are responsible for this function. They are the staff trained and responsible for the overall control of the inmates and the safety of the institution. Likewise, "therapeutic" care, custody and control may include other staff, such as Corrections Counselors, a position which Mr. Zaken held, but these are positions that require meeting inmates one on one and being responsible for them. While Corrections Counselors do this, Superintendent Assistants, Clerk Typists and Administrative Officer do not. Mr. Zaken never knew [Claimant] to exercise care, custody and control of inmates when they worked together at SCI-Pittsburgh. Simply working in the presence of inmates does not render an employee one that is responsible for care, custody and control of inmates.

Mr. Zaken addressed the positions of Clerk Typist and Administrative Officer, in the correctional setting. These positions are not, nor have they ever been, care, custody and control positions. Significantly, and contrary to [Claimant's] assertions, these jobs were likewise not care, custody and control positions while Mr. Zaken worked as SCI-Pittsburgh.

*Id.* at 227b-28b (record citations omitted).

The Board "discount[ed] Claimant's testimony and current recollection of his job functions . . . [and] also discount[ed] and [gave] less weight to the testimony and affidavits introduced by Claimant and his witnesses" for several reasons. S.R.R. at 212b. First, the Board noted that Claimant, while he was still employed, failed to appeal the OA's decision to classify Claimant's positions as superannuation age 60 service. *Id.* at 210b. Second, the Board noted Claimant failed to raise an issue with his superannuation age when he received a retirement benefit estimate and made benefit payment option elections during the process of retiring. *Id.* at 211b. Instead,

12

Claimant first raised the issue 16 years after retiring and receiving benefits, and 26 years after the definition of a Correction Officer was expanded in 1991. *Id.* Thus, the Board opined:

> The time lapse in bringing this appeal is particularly relevant when we consider the credibility and reliability of Claimant's testimony regarding his employment duties. Claimant's testimony attempts to paint a picture far removed from the official specifications for his positions set out by OA and the testimony of the subject matter experts, one of whom was a colleague of Claimant. The fact that Claimant took no action on this issue until long after he retired leads us to the inference that he contemporaneously accepted his age 60 superannuation status, both at the time [the General Assembly amended the definition of a Correction Officer in 1992] and when he was interacting with SERS as part of his termination from State service and applying for an annuity. This leads to the further inference that he did not have, and did not consider that he had, the prerequisite primary duties of care, custody and control of inmates.

*Id.* at 211b-12b.

> The Board also opined that

> [t]he record created at the remand hearing establishes that Claimant was responsible for the compilation an organization of data that was used to determine and analyze various classifications and programs relating to inmates, but that he was not responsible for the inmates' participation in the programs and did not supervise the inmates' activities. Stated simply, the care, custody and control of inmates was not Claimant's principal duty. For these reasons, Claimant is not entitled to the relief he requests.

> Claimant's evidence to support his claim that he was a Correction Officer was thin, at best. His former co-workers' testimony was based on the recollection of events that would have occurred decades ago. As noted above, one witness could not even remember his own job title. Even Claimant's own testimony was insufficient to meet the statutory definition. Claimant testified he was responsible for: 1) van transfers of inmates as a Data Supervisor; 2) meeting with inmates "every day" to conduct depositions as a Data Supervisor; 3) breaking up fights in all three positions; and he even went so far as to testify that he was

13

responsible for "control[ing] their movements," in all three positions, among other egregious allegations. He testified that in all three of his positions with DOC, his principal duty was the care, custody and control of inmates.

Much of Claimant's own testimony supports the administrative nature of his role as an Administrative Officer and a Correctional Superintendent Assistant, doing such things as fingerprinting, answering questions about sentencing structures, notarizing documents, preparing escape warrants, and addressing inmate policy complaints. He specifically testified that he "dealt with all the policies . . . any new policy that came into the institution" and that he was the chairman of the publication review committee, which "reviewed any publication coming into the institution" among other duties that have nothing to do with his primary job duty being the "care, custody and control" of inmates. Merely supervising other employees who do have care, custody and control of inmates does not vicariously transfer that frontline duty to the supervisor. If so, everyone up the chain of command would qualify as a Correction Officer, when it is more likely that the further one is from direct contact with inmates the less likely it is that a State employee meets the definition of Correction Officer.

*Id.* at 225b-26b (record citations omitted).

Accordingly, the Board denied Claimant's request to classify him as a Correction Officer and change his superannuation age to 50. *Id.* at 244b. Claimant appealed the Board's decision to this Court. On appeal, Claimant raises the following issues: (1) whether Claimant carried his burden of proving he qualified as a Correction Officer, (2) whether the hearing officers properly concluded Claimant qualified as a Correction Officer, (3) whether the Board erred in reviewing the record in this matter, (4) whether the Board "without any credible witnesses arbitrarily dismiss[ed] all of the findings of the Hearing Officers," (5) whether the OA's employee should have been permitted to testify despite the OA's failure to intervene, and (6) whether the Board's use of a generic job description allowed for a proper review of Claimant's job duties. *See* Claimant's Br. at 5-6.

14

## II. Analysis

The Board is the ultimate fact finder in proceedings under the Code. *See Tyson v. Pa. Pub. Sch. Employees' Ret. Sys.*, 737 A.2d 325, 328 (Pa. Cmwlth. 1999). Although hearing officers develop a record and provide the Board with proposed findings of fact and conclusions of law, "[i]t is the Board that is the finder of fact," not the hearing officers. *Id.* The Board is permitted to ignore a hearing officer's proposed findings of fact and reach different findings of fact, so long as substantial evidence supports those findings. *Id.* As fact finder, the Board "has exclusive authority to assess witness credibility and resolve evidentiary conflicts." *See Bosnjak v. State Civ. Serv. Comm'n*, 781 A.2d 1280, 1286 (Pa. Cmwlth. 2001); *Rivera v. Unemployment Comp. Bd. of Rev.*, 310 A.3d 348, 352 n. 4 (Pa. Cmwlth. 2024).

While the Board does not defer to the hearing officers on findings of credibility, we "will examine, but not weigh, the evidence," and "may not substitute [our] judgment for that of the [Board]." *See Moorehead v. Civil Serv. Comm'n of Allegheny Cnty.*, 769 A.2d 1233, 1238 (Pa. Cmwlth. 2001). Instead, we review the Board's decisions to determine whether substantial evidence supports the Board's findings of fact, whether the Board committed an error of law, or whether the Board violated any of the parties' constitutional rights. *Parris v. State Employees' Ret. Bd.*, 983 A.2d 821, 826 n.3 (Pa. Cmwlth. 2009). "Substantial evidence is evidence that a reasonable person would accept as adequate to establish the fact in question." *Hite v. City of McKeesport*, 312 A.3d 420, 424 n.8 (Pa. Cmwlth. 2024).

"In determining whether substantial evidence exists to support the Board's findings, we must examine the testimony in the light most favorable to the prevailing party below, giving that party the benefit of any inference which can be drawn

15

logically and reasonably from the evidence." *Johnson v. Unemployment Comp. Bd. of Rev.*, 502 A.2d 738, 740 (Pa. 1986). "[I]t is immaterial that there is evidence in the record supporting a factual finding contrary to that made by the [fact finder], rather, the pertinent inquiry is whether there is any evidence which supports the [fact finder's] factual findings. *W. Penn Allegheny Health Sys., Inc. v. Workers' Comp. Appeal Bd. (Cochenour)*, 251 A.3d 467, 475 (Pa. Cmwlth. 2021).

We begin by noting Claimant's second, third, and fourth issues on appeal lack merit. As outlined above, the hearing officers' recommended findings of fact are simply recommendations. It is the Board, and only the Board, that renders findings of fact. Likewise, the Board has exclusive authority to determine witness credibility. As outlined above, the Board expressly determined the DOC's witnesses were more credible than Claimant and his witnesses. As a result, Claimant's focus on the hearing officers' recommended credibility determinations and findings of fact is misplaced.

Claimant's fifth issue on appeal also fails. Although the OA did not intervene as a party, the DOC offered the testimony of Noll, an employee of the OA. Whether the entity that employs Noll is a party in this matter is irrelevant to whether Hearing Officer Batson should have permitted her testimony. Noll offered relevant testimony, which supported the DOC's case. *See* Pa.R.E. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."); Pa.R.E. 402 ("All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible."). As a result, Hearing Officer Batson did not err in permitting the DOC to offer Noll's testimony.

Claimant's remaining issues on appeal, while presented as whether he met his burden of proof and whether the Board improperly relied on a generic job description to determine his job duties, challenge whether substantial evidence supports the Board's findings of fact. We considered similar arguments in *Parris*, when another former DOC employee requested that the DOC reclassify him as a Correction Officer for purposes of obtaining age 50 superannuation. *See Parris*, 983 A.2d at 823. In *Parris*, the claimant held various positions in the DOC during his years of service. *Id.* at 823-24. "SERS [did] not dispute the fact that [the c]laimant may have spent the majority of his time each week in DOC institutions and that he had contact with inmates during this time." *Id.* at 825. Instead, SERS provided the job descriptions for these positions, none of which included the care, custody and control of inmates. *Id.* The Board rejected the claimant's testimonial account of his job functions in favor of his written job description. *Id.*

This Court concluded "[i]t was well within the province of the Board to reject [the c]laimant's testimonial descriptions of his duties . . . and accept contrary evidence such as the actual duties listed in [the c]laimant's written job description in finding that [the c]laimant's principal duty was not the direct therapeutic treatment, care, custody and control of inmates." *Id.* at 828 (citation omitted). We further explained:

> As pointed out by the Board, [the c]laimant bases his argument that he falls within the definition of correction officer on the idea that since it is undisputed that his job responsibilities brought him into contact with inmates of correctional institutions on a regular basis and required him to make regular visits to those facilities, he was a correction officer within the meaning of the [Code]. However, based on the explicit and unambiguous language of the definition of correction officer, as set forth in Section 5102 of the [Code], we find no error by the Board's rejection of [the c]laimant's assertion that the Board stretch the definition of "correction officer" beyond the borders of its explicit

17

provisions by interposing the words "or contact with" between the words "of" and "inmates" in the definition of correction officer. Contact with inmates and spending large amounts of time in various DOC[] institutions simply does not satisfy the plain and unambiguous requirement that the employee have as his **principal** duty the direct therapeutic treatment, care, custody and control of inmates.

*Id.* at 827-28 (emphasis in original).

Similar to *Parris*, the Board was well within its authority when it rejected Claimant's testimonial description of his job duties in favor of Claimant's written job descriptions and the DOC's testimony about Claimant's job duties. When viewed in a light most favorable to SERS, as the prevailing party below, we conclude substantial evidence in this matter, as fully outlined above, supports the Board's findings. *See Johnson*, 502 A.2d at 740; *W. Penn*, 251 A.3d at 475.

### III. Conclusion

For the reasons set forth above, we affirm the Board's order.

_____
STACY WALLACE, Judge

18

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Timothy G. Collins,
               Petitioner

     v. : No. 825 C.D. 2023

State Employees' Retirement Board,
               Respondent

## **O R D E R**

    **AND NOW**, this 21st day of November 2024, the June 12, 2023 order of the State Employees' Retirement Board is **AFFIRMED**.

 

_____

STACY WALLACE, Judge